**UNITED STATES of America, Plaintiff,**

v.

**James Milton LUND, Defendant.**

**Crim. No. 87–00191–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 5, 1987.

Michael K. Fee, Trial Atty., U.S. Dept. of Justice, Public Integrity Section, Criminal Div., Washington, D.C., for plaintiff.

William S. Aramony, Kator, Scott & Heller, Washington, D.C., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

Defendant, James M. Lund, was indicted on conflict of interest charges brought pur-

suant to 18 U.S.C. § 208(a) (1982) ("Acts affecting a personal financial interest"). Defendant has moved to dismiss the indictment, asserting that his alleged conduct is not proscribed by § 208(a). For the reasons stated below, this court grants defendant's motion and dismisses the indictment.

## I. BACKGROUND

■ Defendant Lund is an employee of the Defense Communications Agency (DCA). In December 1985, Lund married one of his subordinate employees. Thereafter, Lund allegedly continued to supervise his wife without disclosing their relationship to the DCA.

In July 1987, Lund was indicted on three counts of violating 18 U.S.C. § 208(a) (1982). The three violations alleged were: (1) defendant's certifying his wife's work as "acceptable," thus enabling her to collect a within-grade salary increase; (2) selecting his wife over another applicant to fill a certain position within his DCA component; and (3) nominating his wife for a masters' degree program which was to be paid for by the DCA.

Defendant's conduct amounts to simple nepotism.[1] He asserts that this conduct falls outside the statute. In support, he points to the statute's ambiguities, the policies calling for strict construction of penal statutes, and the somewhat arresting fact that neither this 25 year-old conflict of interest statute, nor its century-old progenitor,[2] has ever before been applied to such conduct. Instead, defendant argues, history confirms that § 208's reach must be limited to conflict of interest transactions between defendants in federal agencies and external entities in which he or she, a spouse or a minor child have an interest.

The United States concedes that its interpretation of the statute is novel,[3] but asserts that defendant's conduct is proscribed by the statute's plain meaning. The issue before the Court, therefore, is whether Lund's conduct, which may be characterized as simple nepotism, *i.e.*, the internal promotion of a spouse, is the type of "conflict of interest" intended to be proscribed by § 208.

## II. ANALYSIS

Title 18 U.S.C. § 208(a) provides, in pertinent part, that:

(W)hoever, being an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or of the District of Columbia, including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, partner, organization in which he is serving as officer, director, trustee, partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—

Shall be fined not more than $10,000, or imprisoned not more than two years, or both.

The government argues that under the plain meaning of the statute defendant's conduct is prohibited because he participated "personally and substantially" in a

---

**1.** Nepotism is defined as the bestowal of patronage by public officers in favoring or appointing others to positions by reason of blood or marital relationship to the appointing authority. Black's Law Dictionary 937 (5th ed. 1979).

**2.** 18 U.S.C. § 434; *see also United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 550, 81 S.Ct. 294, 309, 5 L.Ed.2d 568 (1966).

**3.** In oral argument, counsel for the United States advised the Court that he knew of no decisions, prosecutions, or attempted prosecutions in which § 208 had been used to try to reach acts of simple nepotism.

"contract" affecting his spouse (her within-grade salary increase) and in his wife's "applications" for a new position and for free graduate school tuition. In addition, the government asserts that the omnibus term "other particular matter" also embraces the actions taken by Lund. The government urges the Court to give these terms their "ordinary, contemporary and common meaning" in construing § 208(a). *See Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979).

Although "the starting point in every case involving construction of a statute is the language itself," *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring), the ambiguous text of § 208(a) affords little guidance as it refers to "application," "contract," and "other particular matter" without definition. Nor is it plain from the text of § 208 what contracts, applications, or matters Congress intended to criminalize and in what context these terms were to be applied.

The Fourth Circuit faced a similar statutory construction problem in *United States v. Jackson,* 759 F.2d 342 (4th Cir.), *cert. denied,* 474 U.S. 924, 106 S.Ct. 259, 88 L.Ed.2d 265 (1985). There, defendant was convicted of violating 18 U.S.C. § 649 (embezzlement statute) by failing to make timely deposits of cash and checks paid to the United States. Section 649(a) provided that "whoever, having money of the United States in his possession ... fails to deposit it, ... (shall) be guilty of embezzlement." 18 U.S.C. § 649(a) (1982). The issue on appeal was whether checks payable to the United States were to be considered "money" within the meaning of the statute.

Finding that "money" was not defined in § 649(a), the Fourth Circuit examined the dictionary definition of the term. "Dictionary definitions of statutory words that express commonly accepted meaning deserve some weight in the interpretive process." *Id.* at 344 (quoting *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 617–18, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944)). The Court found, however, that "dictionary definitions of 'money' were not helpful in determining congressional intent in employing that term in § 649(a)." *Id.* at 344. Therefore, the Court turned to construing the statute by viewing its "legislative history, prior interpretations, related statutes, and the underlying congressional purpose and public policy considerations." *Id.* at 344.

Here, as in *Jackson,* this Court finds that dictionary definitions of "contract," "application," and "other particular matter" are neither dispositive nor helpful in determining congressional intent in employing these terms in § 208(a). This Court therefore follows the Fourth Circuit's guidance for construing the meaning of statutory terms by examining the legislative history, prior interpretations, related statutes, and the underlying congressional purpose of § 208(a).

#### (1) *Legislative History*

Section 208(a) was modeled after and replaced 18 U.S.C. § 434. S.Rep. No. 2213, 87th Cong., 2d Sess. 13, *reprinted in* 1962 U.S.Code Cong. & Admin.News 3852, 3862 (hereinafter Senate Report). Section 434 had provided that:

> Whoever, being an officer, agent or member of, or directly or indirectly interested in the pecuniary profits or contracts of any corporation, joint-stock company, or association, or of any firm or partnership, *or other business entity,* is employed or acts as an officer or agent of the United States for the transaction of business with such business entity, shall be fined not more than $2,000 or imprisoned not more than two years, or both.

18 U.S.C. § 434 (emphasis added). Section 434, by its terms therefore, applied only to outside conflicts of interest and not "simple" acts of nepotism. This was true of § 434's predecessor as well. As the Supreme Court observed in *United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 550, 81 S.Ct. 294, 309, 5 L.Ed.2d 268 (1966), "Section 434 ... (was) a restatement of a statute adopted in 1863 following

the disclosure by a House Committee of scandalous corruption on the part of government agents whose job it was to procure war materials for the Union Army during the civil war." *Id.* at 548, 81 S.Ct. at 308. Without doubt, therefore, § 434 and its predecessor were aimed at prohibiting government officials from *dealing with an outside entity* in which they had some pecuniary interest, not at acts of simple nepotism.

In 1962, Congress chose to broaden the scope of § 434 by promulgating the current § 208. Significantly, however, the broadening effort was sharply focused on conflicts of interest with *outside entities* and had nothing whatever to do with the simple intra-agency nepotism described in this indictment. In discussing § 208's broadening, the Senate committee stated that subsection (a) improved upon § 434 by "abandoning the limiting concept of 'transaction of business' (and embracing) *any* participation on behalf of the Government in a matter in which the employee has an *outside* financial interest, even though his participation does not involve the transaction of business." Senate Report at 14, 1962 U.S.Code Cong. & Admin.News 3862 (emphasis added). The committee further noted that § 208(a) expanded upon § 434 by "requiring the disqualification of an employee from participation in matters in which his spouse, (minor) child, or persons with whom he has a business connection have an interest," not simply those matters in which only the employee has an interest. *Id.* Finally, in discussing § 208(a)'s deletion of the word "business" from the term "business entity" found in § 434, the committee "made clear that improper dealing by a government employee in connection with *non-profit organizations* is also prescribed (sic)." *Id.*

4. *See Supra* note 3.

5. The court stated that § 208 "was crafted to 'strengthen' its predecessor section (§ 454) by adding, *inter alia*, a proscription against participation by an employee of the executive branch in matters of financial interest to a 'prospective employer' or 'persons with whom he has business connections.' The words 'negotiating' and

In short, § 208(a)'s legislative history supports the construction that the statute was intended to proscribe only outside or "external" conflicts of interest. Nowhere in the legislative history did Congress indicate that § 208(a) would apply to acts of simple internal nepotism as are here at issue. Indeed, the context within which the changes to § 208's predecessor were discussed related solely to outside conflicts of interest. To accept the government's interpretation that Congress, in expanding the reach of § 434, intended to proscribe internal acts of nepotism ignores the legislative history of § 208 and grants unintended scope to the statute.

### (2) *Prior Interpretations*

There are no reported cases on point. Indeed, the United States knows of no attempted prosecutions for simple nepotism brought under § 208(a).[4] All decisions construing § 208(a) concern a government employee's conflict of interest with an outside entity. Yet the government cites these cases as support for the proposition that § 208(a) should be construed broadly to include an internal act of nepotism as an offense within the meaning of the statute. For example, the government cites *United States v. Conlon*, 628 F.2d 150 (D.C.Cir. 1980), *cert. denied*, 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 304 (1982), where the D.C. Circuit held that the words "arrangement" and "negotiating" as used in § 208(a) deserved a broad reading. In *Conlon*, defendant was indicted on conflict of interest charges for negotiating prospective private employment with a company that he was doing business with on behalf of the government. The court, in construing the terms "arrangement" and "negotiating," found that the legislative history of § 208(a) favored a broad construction of these terms.[5] "The words of the statute

'arrangement,' as used in the statute, particularize the kinds of 'business connections' encompassed by this provision. In light of the legislative history of this provision, we must conclude that Congress meant the words 'negotiating' and 'arrangement' to have a broad reading rather than a narrow reading...." *Conlon*, 628 F.2d at 155 (citation omitted).

must be read so as to effectuate the legislative purpose. This will often mean giving the words a broad rather than narrow reading." *Id.* at 154. Thus, the government asserts, the terms "contract," "application," and "other particular matter" should be construed broadly to include acts of internal nepotism.

The government's reliance on *Conlon*, however, is misplaced. *Conlon*, as in all other cases cited in support of the government's position,[6] concerned a government employee's conflict of interest with an outside entity. *Conlon* involved that portion of section 208(a) which prohibits an employee from involving himself in the affairs of an outside concern "with whom he is *negotiating* or has an *arrangement* concerning prospective employment." 18 U.S.C. § 208(a) (emphasis added). The *Conlon* court did not hold that the terms of section 208(a) should be construed to proscribe acts of internal nepotism; the court merely held that defendant's conduct in negotiating with an outside entity fell within the scope of the statute. *Conlon*, 628 F.2d at 156. Thus, *Conlon* is inapposite.

As stated, neither the legislative history of § 208(a) nor the cases interpreting the statute support the government's contention that Lund's conduct is proscribed. To be sure, the legislative history and the reported cases do suggest that § 208(a) should be construed broadly. But such a broad construction is appropriate only in the *proper context.* In situations concerning a government employee's conflict of interest with an outside entity, both the legislative history and prior interpretations indicate that the statute is to be given a broad construction. However, neither the legislative history nor the reported cases indicate that Congress intended § 208(a) to reach acts of simple nepotism, and this Court will not expand the scope of a criminal statute against this background.

This result finds firm support in the settled maxim that penal statutes should be strictly construed. Indeed, fewer principles are any better or more firmly established than that in the absence of legislative authority to the contrary, criminal statutes are to be construed strictly. In the words of Chief Justice Marshall:

> The rule that penal laws are to be construed strictly is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.

*United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820), *quoted in United States v. Boston & Maine R.R.,* 380 U.S. 157, 160, 85 S.Ct. 868, 870, 13 L.Ed.2d 728 (1964). More recently, Mr. Justice Thurgood Marshall stated that strict construction of penal statutes is

> not merely a convenient maxim of statutory construction. Rather, this practice is rooted in fundamental principles of due process, which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited. Thus, to ensure that a legislature speaks with special clarity when marking the boundaries of criminal conduct, courts must decline to impose punishment for actions that are not plainly and unmistakably proscribed.

*Dunn v. United States,* 442 U.S. 100, 112, 99 S.Ct. 2190, 2197, 60 L.Ed.2d 743 (1979) (citations omitted).

Where, as here, a penal statute's language is ambiguous, but the legislative history suggests a narrow construction, strict judicial construction is warranted. In the words of Mr. Justice Holmes:

> Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.

---

**6.** *See also United States v. Gorman,* 807 F.2d 1299 (6th Cir.1986) (construing "negotiation" and "financial interest"); *United States v. Irons,* 640 F.2d 872 (7th Cir.1981) (construing "or otherwise").

When a rule of conduct is laid down in words that evoke in the common mind only the picture of vehicles moving on land, the statute should not be extended to aircraft, simply because it seems to us that a similar policy applies, or upon the speculation that would have been used.

*McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931) (citation omitted).[7]

### (3) *Related Statutes*

Related statutes also support restricting § 208(a) to its intended scope. Congress has expressly and comprehensively addressed simple nepotism elsewhere in the United States Code. Title 5 U.S.C. § 2302(b)(7) provides that any employee who has authority to take personnel action shall not "appoint, employ, promote, advance, or advocate for appointment, employment, promotion or advancement, ... any individual who is a relative," as that term is defined in § 3110(a)(3). Section 3110(a)(3) defines a relative, in part, as a father, mother, son, daughter, husband, or wife. The legislative history of § 2302(b)(7) indicates that this subsection "was intended to prohibit nepotism in appointments or promotions" (i.e., the exact conduct for which Lund has been indicted). S.Rep. No. 969, 95th Cong., 2d Sess. 21, *reprinted in* 1978 U.S.Code Cong. & Admin.News 2723, 2743.

Title 5 U.S.C. § 2302 ("Prohibited personnel practices") was promulgated as part of the Civil Service Reform Act (CSRA), which has been described as "the most comprehensive reform of the Federal work force since passage of the Pendleton Act in 1883." *Id.* at 2723.[8] The CSRA provides for the establishment of the Merit System Protection Board (MSPB) which, *inter alia,* hears cases involving prohibited personnel practices and assesses the appropriate penalty. Successful prosecution of an employee who commits a prohibited personnel practice, including nepotism, could result in the imposition of disciplinary action consisting of "removal, reduction in grade, debarment from Federal employment for a period not to exceed five years, suspension, reprimand, or an assessment of a civil penalty not to exceed $1,000." 5 U.S.C. § 1207(b). Thus, the CSRA is a comprehensive act which allows for civil penalties to be levied against those who engage in certain prohibited practices, including simple nepotism of the sort here alleged.[9]

Existence of a comprehensive scheme that imposes civil penalties for simple nepotism does not, of course, preclude Congress from providing for criminal penalties as well. Nor did enactment of the CSRA repeal any criminal penalties for simple nepotism. None ever existed. But the existence of the CSRA is a piece of persuasive evidence that Congress intended simple nepotism to be covered by the CSRA, not § 208.[10] The comprehensiveness of the Act

---

**7.** This principle is equally well rooted in English law. As Lord Esher stated one hundred years ago: "If there is a reasonable interpretation which will avoid the penalty in a particular case, we must adopt that construction. If there are two reasonable constructions we must give the more lenient one. That is the settled rule for construction of penal statutes." *Tuck & Sons v. Priester,* 19 Q.B.D. 629, 638 (1887), *quoted in* R. Cross, Statutory Interpretation 150 (3rd printing 1981).

**8.** In *Pinar v. Dole,* 747 F.2d 899 (4th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985), the Fourth Circuit noted the Supreme Court's characterization of the CSRA as "an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations." *Id.* at 904 (quoting *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)).

**9.** For example, in *Special Counsel v. DeFord,* 28 M.S.P.R. 98 (MSPB 1985), the MSPB found that forfeiture of $750 in salary was an appropriate penalty for unauthorized retroactive promotion in violation of the CSRA provision prohibiting employee preferences.

**10.** The government cites for support cases construing a related statute, 18 U.S.C. § 207, which employs many of the same terms as § 208(a). These cases hold that the terms of § 207 are not vague and should be construed broadly to conform with legislative intent. *See, e.g., United States v. Coleman,* 805 F.2d 474 (3rd Cir.1986) construing "or otherwise represents"); *United States v. Medico Industries,* 784 F.2d 840 (7th Cir.1986) (construing "contract" and "other particular matter").

The government's reliance on § 207, however, is misplaced. Section 207 simply prohibits former government employees from participating

and its carefully crafted procedures and penalties indicate to this court that Congress intended non-criminal treatment for nepotism. If Congress intended to criminalize nepotism when promulgating § 208 it would and should have done so expressly.[11]

### (4) *Illogical Results*

Illogical results would follow were this Court to accept the government's interpretation of § 208(a). This is yet additional support for restricting § 208 to conflicts of interest with outside entities.

It is the position of the United States that personal and substantial participation by a government official in the within-grade pay increase of any of the persons identified in 18 U.S.C. § 208(a) constitutes a crime. Those persons, in the words of the section, are the official's spouse, minor child, and partner.

According to the government's interpretation, Congress "intended" to make it a crime for a government official to participate in the within-grade pay increase of his minor child, but not a crime if the child has reached his majority. Assuming majority is reached at age 18, the father could be criminally prosecuted under 18 U.S.C. § 208(a) for participating in the within-grade pay increase of his 17 year old daughter, but not his 18 or 30 year old son.

Congress surely intended no such illogical results. By contrast, however, restricting § 208(a) to its historically limited bounds yields more sensible results. It is reasonable to prohibit the conduct of a federal employee who, say, granted contracting favors to an outside entity in which a spouse or minor child had an interest, but to exclude from the prohibition any dealings with an entity in which an adult child has an interest. The typically differing financial relations between parent and

minor children and parent and adult children explains these results.

It should be noted that the inclusion of the phrase "minor child" in § 208(a) was not inadvertent. As the Senate Report explains: "The bill, as it came before the committee, makes no distinction between minor children and those who have attained majority. The committee believes that only the interest of a minor child should serve to disqualify the employee and has amended § 208(a) accordingly." S.Rep. No. 2213, 87th Cong., 2d Sess. 15, *reprinted in* 1962 Code Cong. & Admin.News, 3852, 3862. No such distinction would have been made had Congress intended to criminalize simple nepotism.

### III. CONCLUSION

In essence, the indictment essentially alleges that nepotism within a federal agency where the family relationship is not disclosed constitutes a violation of 18 U.S.C. § 208. It is unclear whether the statute reaches this conduct; its scope is indefinite; its terms are not unambiguous. A broad construction would encompass this alleged internal agency nepotism while a narrow one would exclude it and instead limit the statute's application to conflicts involving federal employees and outside suppliers of goods and services to the government.

History supports the narrower construction. The statute, apparently, has never before been applied to internal agency nepotism; rather it has been used solely as a weapon against conflicts of interest involving government employees and outside suppliers of goods and services to the government. This consistent interpretation and application of the statute is entitled to weight. Also, entitled to weight is the fact that intra-agency nepotism of the sort alleged in the indictment is explicitly and comprehensively dealt with in the CSRA, which provides for a range of civil penalties

in specific matters that they participated in while working for the government. The cases construing § 207, therefore, are inapposite.

**11.** Other sections of the criminal code do expressly mention nepotism. In 18 U.S.C. § 1910, captioned "Nepotism in appointment of receiver

or trustee," Congress has made it a crime for a judge of any court to appoint as a receiver or trustee "any person related to such judge." Clearly, where Congress' intent is to criminalize nepotistic practices in federal employment, it knows how to do so expressly.

for such conduct. All of this, together with the illogical results that would follow from a broad construction and the settled principle calling for strict construction of penal statutes militate strongly against expanding the scope of the statute in this case. To hold otherwise would constitute an unwarranted judicial expansion of a criminal statute in a direction apparently not contemplated by Congress. Accordingly, an order dismissing the indictment has been entered.